**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:11-cv-000289-MR**


| | |
|---|---|
| **JAMIE BARNARD and MARK ZURAWEL,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **O R D E R** |
| ) | |
| ) | |
| **SUNTRUST BANK and APRIL KISSELBURG DAVIS,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint.[1] [Doc. 35].

## I.    PROCEDURAL BACKGROUND

This civil action was brought originally by 46 purchasers of subdivision lots in a failed real estate development known as the Grey Rock subdivision in Lake Lure, North Carolina ("Grey Rock"). [Amended Complaint, Doc. 19 at ¶1]. These purchasers brought suit asserting

_____

[1]The present motion to dismiss was originally filed by both Defendants SunTrust Bank and April Kisselburg Davis. After the motion was filed, however, Defendant Davis filed for bankruptcy. [Doc. 44]. The Plaintiff has since taken a voluntary dismissal as to Defendant Davis. [Doc. 49]. Accordingly, the motion to dismiss will be denied as moot with respect to that Defendant.

violations of the Interstate Land Sales Act, 15 U.S.C. § 1703(a)(2) ("ILSA"), asserting claims for violations of the North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("Chapter 75"), negligent misrepresentation, and fraud, arising from the Defendants' alleged involvement in a scheme to sell lots in Grey Rock at artificially inflated prices. [Id.].

On January 23, 2012, the Magistrate Judge entered an Order questioning whether all of the Plaintiffs were properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure and ordering the parties to show cause why the Plaintiffs should not be severed in this case and why the purchasers of each individual lot should not be required to prosecute their cases separately. [Doc. 15]. After receiving the responses of the parties, the Court ordered the severance of all of the Plaintiffs, and directed them to file separate complaints setting forth their individual causes of action. [Doc. 27].

On August 6, 2012, the Plaintiffs Jamie Barnard ("Barnard") and Mark Zurawel ("Zurawel") filed their Amended Complaint in compliance with the Court's Order. [Doc. 85]. Defendant SunTrust Bank ("SunTrust" or "the Bank") now moves to dismiss this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. 94].

## II.  STANDARD OF REVIEW

In reviewing a motion to dismiss filed pursuant to Rule 12(b)(6), the Court is guided by the Supreme Court's instructions in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) and  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). As the Fourth Circuit has noted, "those decisions require that complaints in civil actions be alleged with greater specificity than previously was required." <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012).

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).  To be "plausible on its face," a plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully."  <u>Iqbal</u>, 556 U.S. at 678.

In reviewing the complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal conclusions." <u>Aziz v. Alcolac, Inc.</u>, 658 F.3d 388, 391 (4th Cir. 2011).  "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." <u>Walters</u>, 684 F.3d at 439.

To survive a Rule 12(b)(6) motion, "a complaint must state a 'plausible claim for relief.'" Id. (quoting Iqbal, 556 U.S. at 678). Determining whether a complaint states a plausible claim for relief is "a context-specific task," Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009), which requires the Court to assess whether the factual allegations of the complaint are sufficient "to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555. As the Fourth Circuit has recently explained:

> To satisfy this standard, a plaintiff need not forecast evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements. Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the plaintiff's claim across the line from conceivable to plausible.

Walters, 684 F.3d at 439 (citations and internal quotation marks omitted).

## III. FACTUAL BACKGROUND

Taking the well-pled factual allegations[2] of the Amended Complaint as true, the following is a summary of the relevant facts.

---

[2] In reciting the relevant factual allegations, the Court has disregarded all "bare legal conclusions" asserted in the Amended Complaint, see Aziz, 658 F.3d at 391, as well as "[t]he mere recital of elements of a cause of action," see Walters, 684 F.3d at 439.

Grey Rock was intended to be a luxury real estate development of approximately 900 homesites with multiple amenities, including multiple clubhouses, an equestrian center, and a retail village, and other attractions, such as an HGTV "Dream Home." [Amended Complaint, Doc. 31 at ¶¶3, 4, 71]. The developers of the subdivision were LR Buffalo Creek, LLC ("LR Buffalo Creek") and its parent company, Land Resource, LLC ("Land Resource") (together, the "Developers"). [Id. at ¶1].

The Plaintiffs purchased Lots 142 and 76, in Phase IB of Grey Rock (the "Barnard and Zurawel Lots") on May 17, 2005, for the purchase price of $134,910 and $89,910, respectively. [Id. at ¶78]. The Plaintiffs financed both of these purchases through loans from SunTrust. [Id. at ¶66].

To promote the development, the Developers hosted extravagant sales events where they flew purchasers to upscale hotels and resorts in North Carolina all-expense paid "get-a-ways," that included expensive activities like golf outings, fly fishing demonstrations, and other activities. [Id. at ¶7]. At these sales events, the Developers' agents created a "cacophony of walkie-talkie communications" claiming that desired lots were being sold quickly and to give the impression that there was great competition to purchase the lots. [Id.]. SunTrust employees appeared and participated in at least some of these events. [Id. at ¶6]. The Developers

also travelled across the country attending real estate conventions in an effort to find buyers who had no knowledge of real estate values in Western North Carolina.  [Id. at ¶49].  SunTrust employees also appeared at these events, touting their loan packages to prospective purchasers and repeatedly vouching for the Developer.  [Id. at ¶50].

At the same time that the Developers were selling lots by making representations about Grey Rock's numerous amenities and promoting their timetable for building these amenities, SunTrust knew, or should have known, that the promised amenities and infrastructure were not being built and in fact would never be built.  [Id. at ¶¶8-14].  For example, SunTrust knew or should have known: that the Developers failed to meet the various timetables for building roads and constructing amenities [Id. at ¶¶10, 13]; that the Developers had failed to pay subcontractors [Id. at ¶12]; that the Developers were unable to provide basic amenities, such as water and electricity to the community [Id.]; that almost all the developments started by Land Resource were either delayed, unfinished, or resulted in poorly finished developments [Id. at ¶19]; and that the Developers were negligently or intentionally permitting or causing the distribution of funds needed to construct the required infrastructure to themselves and to other entities controlled by or related to them, thus rendering the Developers

insolvent and unable to meet their financial obligations. [Id. at ¶43]. SunTrust also knew that the lot values it was financing in Grey Rock were completely dependent upon the promised infrastructure and amenities being built. [Id. at ¶18].

SunTrust also knew, or should have known, that the values placed on the Grey Rock lots were dramatically overstated. [Id. at ¶51]. SunTrust repeatedly funded loans on lots that were repeatedly bought and sold by Ronald Berg's Irrevocable Discretionary Spendthrift Trusts at ever-increasing sales prices. It is alleged that some buyers were required to sign an agreement that made them silent "credit partners" who were then responsible for the payments on the loans under Berg's trust agreements. Berg would then resell the lot to another one of his trusts, where he partnered with another "credit partner" and he would receive 50% of the profit. Berg was in the business of flipping lots and SunTrust provided Berg with the monies needed to fund these transactions at ever increasing prices. [Id. at ¶52]. In all, there were at least 77 transactions involving Ron Berg and his trusts in Grey Rock, 22 of which were funded by SunTrust. Berg bought and sold 23 lots repeatedly. Fourteen of these lots saw increases in value of more than one hundred thousand dollars in a matter of months. [Id. at ¶53]. These inflated one-party transactions affected the

valuations used in all of the other Grey Rock transactions as they established false comparables for all of the other Grey Rock lots. [Id. at ¶56].

The Developers teamed with several lending institutions, including SunTrust, to offer potential purchasers an unusual financing option that essentially required no down payments or periodic payments for two years from borrowers, including these Plaintiffs, so that the Developers could induce borrowers to purchase this raw, undeveloped land at rapidly increasing prices and so that the lending institutions, including SunTrust, could profit from selling loans and their employees could earn fees. [Id. at ¶45]. Specifically, SunTrust and the Developers developed a loan program for Grey Rock whereby lot purchasers received a loan for 90% of the total purchase price of the lot. The additional ten percent of the purchase price was then placed into a "master" account from which interest-only payments were made on the loan for up to twenty four months starting immediately after closing. [Id. at ¶46].

Plaintiff Barnard was referred to Defendant April Kisselburg Davis by a Grey Rock salesperson. When Barnard called Davis she told him that she would email him a personal financial statement to start the loan process and that she would fill out the SunTrust application, which was

emailed to him in New York State from the SunTrust office in Asheville, North Carolina. Mr. Barnard completed the personal financial statement and emailed it to Davis. The application was approved within one business day of its submission. [Id. at 79].

When Barnard initially spoke to Davis, he told her that although his partner Mark Zurawel had purchased a lot in another Land Resouces subdivision by the name of Riversea Plantation, he was conservative about his finances and was not sure about the decision to buy. [Id. at 80]. Davis told Barnard that she did many loans in Riversea Plantation and that the developer sold it out about a year and a half ahead of schedule during their three or four big weekend sales events and many buyers resold their lots immediately and walked away with good profits. [Id. at ¶81]. Davis said that Grey Rock "would go the same route." [Id.].

Davis also stated to Mr. Barnard that Grey Rock was much more high end than Riversea so the potential to make much higher profits existed in Grey Rock. [Id. at ¶82]. Barnard told Davis that his salesperson said he hand-picked two lots near the HGTV Dream Home for him. [Id. at ¶83]. Davis told Barnard that sales and prices in Cumberland Harbour, another Land Resource community, went up rapidly after the existence of an HGTV Dream Home was announced. [Id. at ¶84]. Davis further stated that

Cumberland's track record was proof that the Dream Home was a powerful promotional tool that would drive community sales and prices. [Id. at ¶85]. Davis told Barnard that lot prices would increase very rapidly in Grey Rock similar to Cumberland Harbour and that thousands of inquiries would come in each day and millions would register to try and win the Dream Home, thereby generating exposure for Grey Rock "that money could not buy." [Id.].

Davis asked Mr. Barnard if he was going to take advantage of the "no payments for 24 months" option and Mr. Barnard told her that he would rather take the developer 10% discount option and obtain a longer-term mortgage. [Id. at ¶86]. Barnard told Davis that he did not like the two-year balloon payment loan because he was afraid of not being able to sell the property right away and then getting stuck with the headache of trying to find a bank to refinance. He also stated that interest rates were very low right at that time and could go up, so he would like to lock into a longer-term loan. [Id. at ¶87].

Davis told Barnard that this special financing program was worked out with the Bank and the Developers because they knew that lots would resell before the end of the term. [Id. at ¶88]. Davis also told Barnard that the shorter the loan term, the lower the interest rates would be. Therefore,

even if he was paying interest on the loan after closing, this would keep Barnard's costs down until the lot sold.  [Id. at ¶89].

Barnard and Zurawel financed their purchase of Lot 142 by taking a two year interest-only loan for $120,419 at a rate of 6.0% with total finance charges over the two year term of the loan in the amount of $15,657.59.  [Id. at ¶90].  They financed their purchase of Lot 176 by taking a two year interest-only loan for $80,919 at a rate of 6.0% with the total finance charges over the two year term of the loan in the amount of $10,726.50.  [Id. at ¶91].

The Developers ultimately collected approximately $90,000,000 in revenues from the sale of approximately 435 lots in Grey Rock alone.  [Id. at ¶58].  In 2008, LR Buffalo Creek's affiliated entities, and their parent company, Land Resource, voluntarily filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Middle District of Florida.  The various bankruptcy actions have been consolidated and converted into a Chapter 7 liquidation proceeding.  At the time of the bankruptcy filing, LR Buffalo Creek reported its cash holdings to be $905.00.  [Id. at ¶59].  Grey Rock's infrastructure and amenities were never completed, and the Grey Rock lots that SunTrust helped sell are now listed for sale at a fraction of their original selling prices. [Id. at ¶60].

The Plaintiffs themselves made unsuccessful attempts to sell their lots. When the loans came due, SunTrust refused to refinance the Plaintiffs' loans, and they were forced to refinance with Wachovia Bank, thus incurring additional fees and expenses to maintain the loans on the properties. [Id. at ¶93].

## IV. ANALYSIS

### A. Plausibility of the Plaintiffs' Claims

The Bank first contends that the Plaintiffs' claims are subject to dismissal as they are implausible.

Contrary to the arguments of the Bank, however, the Plaintiffs' claims are sufficiently plausible to survive a motion to dismiss. As the this Court explained in a similar case involving counterclaims by a number of borrowers in a similar subdivision against Synovus Bank:

> [I]n the present case, the Defendants' allegations, when assumed to be true, establish a plausible reason (*i.e.,* the desire for short-term profitability) for the Bank's willingness to knowingly make under-collateralized loans to the Defendants, even if such loans may have been, as argued by the Bank, contrary to the Bank's long-term financial interests. Further, the Defendants have pled sufficient factual allegations detailing the basis of their claims against the Bank….
>
> As the events of the recent economic crisis have demonstrated, financial institutions do not always

make the most prudent business decisions, and
they sometimes may accept what would otherwise
appear to be unreasonable economic risks for the
sake of immediate, short-term profitability. Thus,
while the Bank's conduct, as alleged by the
Defendants, may not appear to have been the most
prudent course of action for the Bank to take in
terms of its long-term business interests, that
certainly does not mean that such conduct is not
plausible as a matter of law. Indeed, as the
Magistrate Judge correctly noted, assuming the
truth of the Defendants' Counterclaims, "Synovus
Bank would not be the first corporation in the history
of modern economics to undertake an action that
carried substantial risk to its long term financial
viability in order to increase short term profits or
revenue." [Doc. 36 at 14].

Synovus Bank v. Karp, 887 F. Supp. 2d 677, 685-86 (W.D.N.C. 2012)

(footnote omitted).[3]

In essence, the Bank's argument appears to be that if the theory of

recovery underlying the claim is *unlikely,* the claim is subject to dismissal

on the basis of implausibility. Such an argument, however, reads too much

into the Iqbal standard.  Iqbal does not require the Court to determine the

*likelihood* of the facts alleged but rather to determine whether the factual

allegations pled in support of that claim are *sufficient* to render the claim

*plausible*.  For the reasons stated above, the Court finds the Plaintiffs'

---

[3] While the Bank vigorously attempts to distinguish Karp, the Court sees no basis to
distinguish the allegations asserted by the borrowers in Karp from the allegations
asserted in the present case.

claims sufficiently plausible to survive a motion to dismiss.  See McCauley

v. Home Loan Inv. Bank, FSB, 710 F.3d 551, 556 n.4 (4th Cir. 2013)

(rejecting argument that purchasers' claim was implausible where

purchasers alleged that bank had "incentives to inflate the value of a home

because the larger the loan, the larger the proceeds to the lender").  The

Bank's motion to dismiss on the grounds of implausibility is denied.

## B. Whether Plaintiffs' Claims are Barred by the Applicable Statutes of Limitations

Next, the Bank argues that because all of the Plaintiffs' claims are

premised on actions or representations that occurred before they

purchased their Lots in 2005, their claims are now time barred.

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal

sufficiency of the allegations of the complaint; significantly, a Rule 12(b)(6)

motion "does not resolve contests surrounding the facts, the merits of a

claim, or the applicability of defenses."  Edwards v. City of Goldsboro, 178

F.3d 231, 243-44 (4th Cir. 1999) (quoting Republican Party v. Martin, 980

F.2d 943, 952 (4th Cir. 1992).  As such, "asserting an affirmative defense,

like a statute of limitations defense, in a motion to dismiss presents a

particular 'procedural stumbling block' for defendants."  CSX Transp., Inc.

v. Gilkison, 406 F. App'x 723, 728 (4th Cir. 2010) (per curiam) (quoting

Fredericksburg & Potomac R.R. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993)).

As the Fourth Circuit has explained:

> [A] motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred.  But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6).   This principle only applies, however, if all facts necessary to the affirmative defense "clearly appear[ ] *on the face of the complaint.*"

Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (quoting Forst, 4 F.3d at 250); see also Johnson v. N.C. Dep't of Transp., 107 N.C. App. 63, 67, 418 S.E.2d 700, 702 (1992) (holding that dismissal under Rule 12(b)(6) on the grounds of affirmative defense of statute of limitations is proper "if the complaint on its face reveals an 'insurmountable bar' to recovery") (citation omitted).  "To require otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." CSX Transp., 406 F. App'x at 728-29 (quoting Goodman, 494 F.3d at 466).

In the present case, the Plaintiffs have asserted four causes of action in their Amended Complaint, namely, claims for fraud, negligent

misrepresentation, violations of Chapter 75, and violations of ILSA.  Under North Carolina law, the statute of limitations applicable to fraud and misrepresentation claims is three years.  See N.C. Gen. Stat. § 1-52.  This three-year statute of limitations begins to run "from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence."  Hunter v. Guardian Life Ins. Co., 162 N.C. App. 477, 484, 593 S.E.2d 595, 601, rev. denied, 358 N.C. 543, 599 S.E.2d 48 (2004) (citation omitted).

Claims under Chapter 75 are subject to a four-year statute of limitations.  See N.C. Gen. Stat. § 75-16.2.  While a Chapter 75 claim generally accrues when the violation of the statute occurs, see Jones v. Asheville Radiological Group, PA, 134 N.C. App. 520, 527, 518 S.E.2d 528, 533 (1999), rev'd in part on other grounds, 351 N.C. 348, 524 S.E.2d 804 (2000), where the claim is based on fraudulent conduct, courts have determined that the cause of action arises at the time that the fraudulent conduct was discovered or should have been discovered with the exercise of due diligence.  See, e.g., Faircloth v. Nat'l Home Loan Corp., 313 F.Supp.2d 544, 553-54 (M.D.N.C. 2003), aff'd, 87 F. App'x 314 (2004).

Finally, ILSA claims are subject to a three-year statute of limitations.  See 15 U.S.C. § 1711.  The accrual date of an ILSA claim, however,

depends on the particular type of claim being asserted.  For example, for an alleged violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C)[4], the statute of limitations began to run "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2).  The statute of limitations for an alleged violation of § 1702(a)(2)(D)[5] begins to run three years after the date of signing of the contract of sale.  See 15 U.S.C. § 1711(a)(1).  This limitations period, however, may be subject to equitable tolling if the plaintiffs can

---

[4] Subsections (A)-(C) of § 1703(a)(2) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property:

> (A) to employ any device, scheme, or artifice to defraud;
>
> (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; [or]
>
> (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser[.]

15 U.S.C. § 1703(a)(2)(A)-(C).

[5] Section 1703(a)(2)(D) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property, "to represent that roads, sewer, water, gas, or electric service or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed."  15 U.S.C. § 1703(a)(2)(D).

demonstrate "(1) that they exercised due diligence to discover their cause of action before the limitations period ran; and (2) that the defendant committed an affirmative act of fraudulent concealment to frustrate discovery despite due diligence." Orsi v. Kirkwood, 999 F.2d 86, 89 (4th Cir. 1993); Lukenas v. Bryce's Mountain Resorts, Inc., 538 F.2d 594, 597 (4th Cir. 1976); Dexter v. Lake Creek Corp., No. 7:10-CV-226-D, 2013 WL 1898381, at *4 (E.D.N.C. May 7, 2013).

Thus, for each of these claims, a determination will have to be made as to when the Plaintiffs knew or should have known of the alleged fraudulent conduct and statutory violations. Viewing the factual allegations in the light most favorable to the Plaintiffs, nothing "clearly appears" on the face of the Amended Complaint to show that they knew or should have known at the time of the closing in 2005 of the Bank's alleged wrongful conduct. See CSX Transp., 406 F. App'x at 729. Determining the state of the Plaintiffs' knowledge and the reasonableness of their due diligence are fact-intensive inquiries which would be better resolved at the summary judgment stage or, if necessary, at trial. See id. at 730. Accordingly, the Bank's Motion to Dismiss the Plaintiffs' claims on the basis of the applicable statute of limitations is denied.

**C.    Plaintiffs' Claim for Violation of the ILSA**

The Bank also seeks dismissal of the Plaintiffs' ILSA claim on the grounds that the Bank was not a "developer" or an "agent" of a developer in Grey Rock.

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976). "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." Burns v. Duplin Land Dev., Inc., 621 F.Supp.2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; see also Burns, 621 F.Supp.2d at 301. A "developer" is defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. . . ." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Generally speaking, a lending institution acting in the ordinary course of its business is not considered a "developer" within the meaning of the ILSA.  See Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases); Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc., 757 F.Supp. 698, 702 (W.D. Va. 1990).  "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or sale of property that liability may arise under ILSA."  Thompson v. Bank of Am., No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

As the United States District Court for the Western District of Virginia has explained:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort.  It is participating to an acceptable degree in the marketing of the project.  It has gone beyond its function as a commercial bank to lot purchasers.

Hammar, 757 F. Supp. at 702-03.  The Fourth Circuit recently reached a similar conclusion, holding that the anti-fraud provision of the ILSA "encompasses entities that participated in the advertising and promotional

efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." In re Total Realty Mgmt., LLC, 706 F.3d 245, 253 (4th Cir. 2013) (finding allegations that marketer's representatives spoke at developer's sales seminars and disseminated its marketing materials there as well as on the developer's website were sufficient to state an ILSA claim against marketer).

Mindful of the Fourth Circuit's admonition that the ILSA must be construed broadly to effectuate its remedial goals, see Olsen v. Lake Country, Inc., 955 F.2d 203, 205 (4th Cir. 1991) (per curiam), the Court concludes that the Plaintiffs' Complaint sets forth sufficient plausible allegations to state a claim under the ILSA against the Bank. The Plaintiffs allege that the Bank, through its employees, participated in sales events with the Developer to encourage individuals to buy lots at Grey Rock. Further, the Complaint is replete with allegations of statements made by loan officers – purportedly at the behest and encouragement of the Bank – promoting the subdivision and otherwise encouraging the Plaintiffs to purchase a lot. While it remains to be seen whether the Plaintiffs can present a forecast of evidence to support this claim, the Court concludes that the factual allegations of the Complaint are sufficient to state a claim under the ILSA.

**D.      Plaintiffs' Claim for Negligent Misrepresentation**

Next, the Bank seeks dismissal of the Plaintiffs' claim for negligent misrepresentation, arguing that it owed the Plaintiffs no duty upon which such a cause of action could be based.

A bank owes a borrower only those duties that are specified in the loan agreement.   See Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party").   The Plaintiffs nevertheless contend that the Bank, through Langley, undertook "a position of special confidence" when Langley elected to make numerous representations to the Plaintiffs regarding the nature and quality of their investment at River Rock and thus "had a common law duty to be truthful." [Doc. 41 at 8].   The Plaintiffs' argument in this regard, however, is entirely circular.   The Plaintiffs have not identified any cases construing North Carolina law that recognize an extra-contractual duty arises simply because misrepresentations are made before loan agreements are executed.   Indeed, at least one case in which prior representations were apparently made, Branch Banking & Trust Company v. Thompson, did not mention such a distinction.   See 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (noting misrepresentation by BB&T officers prior to execution of loan

documents but concluding that "[t]he record does not reveal any facts suggesting that the [defendants] reposed any sort of special confidence in BB&T which would serve to give rise to a fiduciary relationship."), disc. rev. denied, 332 N.C. 482, 421 S.E.2d 350 (1992); see also Karp, 887 F.Supp.2d at 690 (dismissing substantially similar claims).

Here, the Plaintiffs have made insufficiently plausible allegations of any type of special relationship between them and the Bank beyond that of the typical lender-borrower relationship. Accordingly, the Plaintiffs' negligent misrepresentation claim against the Bank is hereby dismissed.

### E.    Plaintiffs' Claim for Fraud

In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party. Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007). Additionally, the party must demonstrate any reliance on the false representations was reasonable. See id. "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." Cobb v. Pennsylvania Life Ins. Co., 715 S.E.2d 541, 549 (N.C. Ct. App. 2011).

Here, the Bank seeks dismissal of the Plaintiffs' fraud claim, arguing that the Amended Complaint fails to state adequate allegations to establish that the Plaintiffs' reliance on the alleged misrepresentations was reasonable or justifiable.  Specifically, the Bank contends that the Amended Complaint fails to allege specific facts demonstrating their own diligence in investigating the property prior to purchase.

Contrary to the Bank's arguments, the Plaintiffs have asserted adequate allegations to establish justifiable reliance.  The Plaintiffs contend that they could not reasonably have discovered the truth about Davis's misrepresentations [see Amended Complaint, Doc. 31 at ¶124], and it is not clear on the face of the Amended Complaint that the Plaintiffs' reliance on Davis's statements was not reasonable or justifiable.   Indeed, whether the Plaintiffs were justified in relying upon Davis's statements is a fact-intensive inquiry which will depend on the development of evidence in the record and in particular the parties' testimony.  In short, this is a matter best resolved on a motion for summary judgment or at trial, not on a motion to dismiss.

The Bank further contends that the Plaintiffs' fraud claim must be dismissed to the extent that it relies upon mere expressions of opinion of the future value of the property.   "A representation which is nothing more

than an opinion as to the value of property, absent something more, does not constitute actionable fraud." Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984). While the majority of allegations underlying the Plaintiffs' fraud claim are merely statements of opinions expressed by Davis, "a statement purporting to be opinion may be the basis for fraud if, at the time it is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwitch v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999). Here, the Plaintiffs have alleged that Davis knowingly made such false statements with the intent to deceive, thereby implying that Davis did not in fact hold the opinions which she expressed. [See id. at ¶¶120-22]. Thus, even if some of Davis's representations were merely expressions of opinion, the Plaintiffs have still stated an adequate basis for their fraud claim to survive a Rule 12(b)(6) motion. See Karp, 887 F.Supp.2d at 687-88.

The misrepresentations on which the Plaintiffs base their fraud claim are admittedly thin. Most of the representations alleged amount to nothing more than statements of opinion or sales "puffery" and would not survive a motion to dismiss absent the plausible allegation that such statements were

made with the knowledge that such statements were not true or that such opinions were not actually held by the speaker.  See id.  Because the Plaintiffs' Amended Complaint, construed in the light most favorable to the Plaintiffs, appears to make these necessary additional allegations, it would be inappropriate to dismiss these claims at this time.  The Court expresses no opinion, however, regarding whether the Plaintiffs can produce a sufficient forecast of evidence of the speaker's intent and knowledge at the time the statements were made, as that issue would be more appropriately resolved at the summary judgment stage.  For now, the Court concludes that although the allegations are weak at best, they are sufficiently pled to withstand the Bank's Rule 12(b)(6) motion.

**F.     Plaintiffs' Claim for Violations of Chapter 75**

The Bank contends that the Plaintiffs' Chapter 75 claim should be dismissed because North Carolina law does not apply to their claim. Specifically, the Bank argues that under North Carolina choice of law principles, the law of the state where the financial harm occurred should apply.  Because the Plaintiffs were residents of New York at the time of the purchase of their lot, the Bank's argument goes, any financial injury that

occurred was felt in the Plaintiffs' state of residence, not in North Carolina, and thus Chapter 75 is inapplicable to them.[6]

The Court declines to address this choice of law issue at this time. Even if the Court were to determine that North Carolina did not apply, the Court would apply the substantive law of the proper jurisdiction and determine whether the Plaintiffs have stated a claim under that state's relevant consumer protection statute. The Bank, however, does not address whether another consumer protection law is applicable in this case or whether the Plaintiffs have stated any claim under that statute, and thus the Court is unable to make a determination as to the applicable choice of law.

Further, the record before the Court is insufficiently developed to resolve the choice of law issue at this time. In North Carolina, courts traditionally apply the rule of *lex loci delicti* to tort claims. <u>See</u> <u>Boudreau v. Baughman</u>, 322 N.C. 331, 335, 368 S.E.2d 849, 853-54 (1988). "For actions sounding in tort, the state where the injury occurred is considered the situs of the claim." <u>Id.</u> at 335, 368 S.E.2d at 854. Similarly, in cases involving claims for unfair or deceptive trade practice, North Carolina courts

---

[6] Oddly, the Bank does not make a similar argument regarding the Plaintiffs' other tort claims, which are subject to similar choice of law rules.

have applied the law of the state where the injuries were sustained.  See ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 49 n.11 (4th Cir. 1983); Lloyd v. Carnation Co., 61 N.C. App. 381, 387-88, 301 S.E.2d 414, 418 (1983); United Va. Bank v. Air-Lift Assoc., Inc., 79 N.C. App. 315, 321, 339 S.E.2d 90, 94 (1986).

In cases involving financial injuries, courts have considered the injury to be sustained "where the economic loss was felt."  Clifford v. Am. Int'l Specialty Lines Ins. Co., No. 1:04CV486, 2005 WL 2313907, at *8 (M.D.N.C. Sep. 21, 2005).  While the economic loss may be suffered in the state of the plaintiff's residence or principal place of business, courts routinely have rejected applying a bright line rule in determining the situs of the injury.  See Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 697, 698 S.E.2d 719, 726 (2010), rev. denied, 706 S.E.2d 235 (N.C. 2011) ("[A] significant number of cases exist where a plaintiff has clearly suffered its pecuniary loss in a particular state, irrespective of that plaintiff's residence or principal place of business. In those cases, the lex loci test requires application of the law of the state where the plaintiff has actually suffered harm."); see also United Dominion Indus. Inc. v. Overhead Door Corp., 762 F.Supp. 126, 130 (W.D.N.C. 1991) (noting that in commercial actions, "determining the place that the injury occurred is not especially

self-evident").  Following these principles, this Court recently applied North Carolina law to claims asserted by South Carolina residents who bought lots in a North Carolina development, reasoning that the financial injury occurred here because the property was located in North Carolina and the real estate transaction was completed here.  Synovus Bank v. Coleman, 887 F.Supp.2d 659, 669-70 (W.D.N.C. 2012).

In the present case, the record is not sufficiently developed to determine whether North Carolina law is applicable to the Plaintiffs' claim. While the real estate at issue is located here, it is unclear from the Amended Complaint where the closing occurred.  See United Dominion Indus., 762 F.Supp. at 130-31 (holding that Texas law applied to unfair and deceptive trade practice claim because closing of sale took place in Texas); United Va. Bank, 79 N.C. App. at 321, 339 S.E.2d at 94 (holding that Virginia law applied where bank's wrongful sale of collateral occurred in Virginia).  While the location of the closing itself is not necessary dispositive of the issue, absent those kind of additional facts, the Court cannot make a determination of the choice of law issue at this time.  Accordingly, the Bank's motion to dismiss the Chapter 75 claim will be denied.  The parties may revisit the choice of law issue at the summary judgment stage, at

which time the Court will be in a better position to determine which state law is applicable to the Plaintiffs' claim.

The Bank further contends that because the Plaintiffs' Chapter 75 claim is based on the same alleged misrepresentations and omissions that form the basis of their fraud and negligent misrepresentation claims, the Chapter 75 claim should also fail.

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." <u>Spartan Leasing, Inc. v. Pollard</u>, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). A deceptive practice is one that has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required." <u>Id.</u> at 461, 400 S.E.2d at 482.

To the extent that the Plaintiffs' Chapter 75 claim is based on negligent misrepresentations that the Court has determined are not plausible claims, these allegations will not be considered. Because the Court has concluded that the Plaintiffs have stated a plausible fraud claim with sufficient particularity to survive a motion to dismiss, however, the Court likewise will deny the Bank's Motion to Dismiss with respect to the

Chapter 75 claim.  "[P]roof of fraud necessarily constitutes a violation of the prohibition against unfair and deceptive acts."  <u>Karp</u>, 887 F.Supp.2d at 688 (quoting <u>Winston Realty Co. v. G.H.G., Inc.</u>, 314 N.C. 90, 97, 331 S.E.2d 677, 681 (1985)).

## V.   CONCLUSION

**IT IS, THEREFORE ORDERED** that the Defendants' Motion to Dismiss [Doc. 35] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, with respect to the Plaintiffs' claim against Suntrust Bank for negligent misrepresentation, the Motion to Dismiss [Doc. 35] is **GRANTED** and this claim is **DISMISSED**.  In all other respects, the Motion to Dismiss [Doc. 35] is **DENIED**.

**IT IS SO ORDERED.**

Signed: September 30, 2013

Martin Reidinger
United States District Judge